548

EXXON CORPORATION (formerly Humble Oil & Refining Company)

v.

The UNITED STATES.

No. 816–71.

United States Court of Claims.

Dec. 15, 1976.

David W. Richmond, Atty., of record, Washington, D.C., for plaintiff. Walter B. Morgan, Harold A. Ranzau, John J. Hollis,

Robert L. Moore, II and Miller & Chevalier, Washington, D.C., of counsel.

Donald H. Olson, Washington, D.C., with whom was Asst. Atty. Gen. Scott P. Crampton, Washington, D.C., for defendant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, KASHIWA, KUNZIG and BENNETT, Judges, en banc.

## OPINION

### PER CURIAM:

This case comes before the court on defendant's exceptions, filed April 13, 1976, to the recommended decision of Trial Judge Lloyd Fletcher, filed January 29, 1976, pursuant to Rule 134(h), having been considered on the briefs and oral argument of counsel. Since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the said decision as the basis for its judgment in this case.* It is, therefore, concluded that plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c).

## OPINION OF TRIAL JUDGE

FLETCHER, Trial Judge:

In this case of first impression, the plaintiff, Exxon Corporation, seeks to recover an alleged overpayment of federal corporate income taxes and assessed interest thereon for the taxable year 1954.[1] The tax return in question reported the operations of Humble Oil and Refining Company (Humble), a predecessor company which has been merged into Exxon, the present owner of the instant claim. The single issue is whether certain costs and expenditures incurred by Humble in the construction of offshore platforms required for the drilling of oil and gas wells in the Gulf of Mexico, are subject to the section 263(c) option for "intangible drilling and development costs."[2] In the event the option was available to Humble, it would be permitted an election either to capitalize or to deduct as expense all "intangible drilling and development costs," as that phrase is defined in Treasury Regulations 118 at § 39.23(m)–16. Availability of the option depends upon classification of the expenditures as intangible drilling and development costs, as so defined, and Exxon asserts that under the precise language of the regulation, Humble's expenditures clearly qualified for the option to expense such costs. The Government argues just as vigorously under the same regulation that the expenditures cannot qualify for the reasons stated by the Internal Revenue Service in its Rev.Rul. 70–596, 1970–2 C.B. 68, and therefore must be treated as capital expenditures subject only to a depreciation allowance.

For the reasons discussed below, it is my opinion that the expenditures in question do qualify under the regulations as "intangible drilling and development costs" and, hence, are subject to the option, which Humble admittedly exercised, and were properly deducted as expense items in its 1954 return.

Most of the facts are undisputed.[3] During 1954 Humble built six templet-type offshore drilling and production platforms,[4]

---

* The concurring opinions of Judges Davis, Bennett and Kunzig and the concurring in part and dissenting in part opinion of Judge Kashiwa follow the opinion of the trial judge which has been adopted by the court.

1. The precise tax period in question is January 1, 1954 through November 11, 1954. The remainder of the calendar year, not here in issue, was reported on a consolidated return.

2. 26 U.S.C. § 263(c). It has been noted that this option, although long available, was not clearly authorized by statute until the enact-

ment of the Internal Revenue Code of 1954, and that its "history is a curious one, indeed." *Harper Oil Company v. United States*, 425 F.2d 1335, 1338 (10th Cir., 1970).

3. They are here summarized only. The detailed facts are set forth in the Findings of Fact below.

4. A templet-type platform may be described generally as a large deck area, on which are mounted derricks and various other drilling paraphernalia, all supported above sea level by "templets", which are compound, trussed

extended one of the six, and also extended one platform which had been built prior to 1954. This platform construction was done for installation on offshore leases in the Gulf of Mexico granted to Humble by the State of Louisiana which leases gave Humble an operating interest in any oil and gas discovered thereon.

The building of these platforms and platform extensions involved several stages. First, they were designed by Humble engineers who prepared detailed plans and specifications from previously furnished information as to water depths, soil, wind, tide, and storm conditions experienced at the well site, coupled with other information as to the desired size of the deck area, weight, and location of drilling equipment, and number and depth of wells to be drilled. Secondly, through competitive bidding, Humble would then engage the services of a marine construction contractor, such as W. Horace Williams Company, whose job was to fabricate on land as much of the platform as was practicable. This land-phase portion of the work was carried out using some materials (usually the heavier steel items) supplied to the contractor by Humble.[5] The remaining items of necessary materials were ordered by the contractor specifically for the Humble project. During the land phase, Humble assigned one or more of its engineers to oversee the progress of the work at the contractor's fabrication yard and assure compliance with Humble's specifications. In addition, a Humble welding inspector was assigned to each job for the purpose of testing the contractor's iron workers (burners, welders, and fitters) for proficiency and inspecting the finished welds on a periodic basis.

Upon completion of the work called for by the land-phase construction contract, the partially constructed platform was loaded on a barge for transport to the drilling site. At this point, the third or so-called "water phase" of the construction began, and it was performed under a separate contract. While in transit, further welding, cutting, and fitting work was performed on the platform pieces, again under the oversight of a Humble engineer and welding inspector, who lived aboard the barge during the water-phase construction. Upon completion of this work, the platform pieces were lifted from the barge, assembled, and anchored to the sea floor by use of a large floating crane. The deck parts were then positioned and the various drilling and other equipment was installed thereon. The termination of the water phase marked the completion of the platform's construction, whereupon it was ready for drilling operations.

Of course, during these three phases of construction, numerous costs were incurred and paid by Humble. For example, during the design phase, Humble utilized its own engineers to design the required platforms and to draft the construction plans and specifications. Other Humble personnel from the Exploration Department were used to determine the most favorable locations for well sites, and, to this end, Humble often employed outside consulting engineers to obtain and furnish information regarding soil conditions in those areas.

During the land phase when the initial prefabrications were made, Humble incurred other costs. The land contracts awarded were typical fixed-price contracts which included the cost of labor, materials, fuel, hauling, insurance, and taxes paid by the contractor as well as the contractor's overhead and profit. Also, during the land phase, Humble incurred the costs of trans-

structures, analogous in function to table legs but composed of several large vertical steel beams and pipes (usually an even number) arranged in a rectangular fashion with bars running between the pipes for support and spacing. Several templets are ordinarily used to support one deck, the number depending on the size, weight, and other features of the deck and equipment to be installed thereon.

5. The material to be supplied by Humble was recorded on a list furnished to the contractor which designated whether the materials so listed were new or had been salvaged from other platforms.

porting the materials which it had agreed to supply to the contractor's yard as well as the costs of assigning a welding inspector and engineer to monitor the contractor's performance. For the water phase, Humble typically awarded cost-plus-fixed-fee contracts because of the hazards and uncertainties incident to construction work at sea. The costs incurred at this stage were similar to those of the land phase covering such items as materials, wages, fuel, barge rentals, floating crane and other equipment rentals, insurance, taxes, meals and lodging during construction at the well site, as well as contractor's profit and overhead. Of these various costs, the ones here in issue are the costs incurred for labor, fuel, repairs, supplies, and hauling during the land-phase construction of offshore platforms, together with the same categories of costs incurred during the water-phase construction of the platforms (other than the cost of transporting the platform parts to the well site which defendant concedes are allowable) prior to the time that the platform pieces and related materials were lifted by crane from the construction barge.

The defendant has conceded that all costs for labor, fuel, repairs, hauling, and supplies incurred by Humble for the installation of the platform after it was lifted from the barge were subject to the option and currently deductible as intangible drilling and development costs. It contends, however, that such costs incurred prior to that time are not subject to the option because they were pre-installation expenditures by which Humble acquired what the regulation calls "tangible property ordinarily considered as having a salvage value."

It is true that Humble would dismantle platforms at locations where no economically productive wells resulted from drilling operations. The dismantling generally oc-

curred in the reverse order of the prior erection and assembly process. The dismantled platform parts, which were roughly the same prefabricated parts as existed at the completion of the land-phase contract, would then be taken ashore and stored. For the most part, however, Humble's 1954 offshore platforms proved productive and have remained at the well location for production purposes. Hence, as stated above, all of the platforms and platform extensions in issue are still in place in the Gulf with the exception of platform 1428B which was dismantled during 1954 and 1955; most of its parts were reconditioned and used in the construction of another platform.[6]

Humble's rejoinder to defendant's salvage argument is simply that it raises a false and irrelevant issue. Humble points out that it always capitalized, and never expensed, the costs of the actual materials used in constructing the platforms, such as pipe, beams, and similar materials which are the only salvable items. The costs which it expensed were for items such as labor, fuel, etc., which in themselves do not have a salvage value and hence are clearly intangible drilling and development costs.

Since both parties agree that the resolution of this dispute requires an interpretation of Reg. 118, § 39.23(m)–16, the starting point must be a quotation of the exact text of the regulation insofar as pertinent here. The pertinent parts thereof are as follows:

(a) Items chargeable to capital or to expense at taxpayer's option:

(1) Option with respect to intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract

---

**6.** In addition to salvaging such materials as it could, Humble had other reasons for dismantling and removing unproductive platforms instead of simply leaving them in the water. Since Humble knew it could be directed by the Army District to remove a platform upon expiration of its permit in order to reduce navigational hazards posed by the platform, it elected to do so as soon as the platform ceased to be

useful. Humble also recognized that by removing an unproductive platform as soon as possible and even prior to expiration of the permit, it could thereby avoid the substantial costs of maintaining navigational aids as required by the United States Coast Guard. Humble's exposure to liability for damages resulting from possible ship collisions with the structures was also reduced by early dismantling.

granting working or operating rights) in the development of oil and gas properties: All expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas, may, at the option of the operator, be deducted from gross income as an expense or charged to capital account. Such expenditures have for convenience been termed intangible drilling and development costs. They include the cost to operators of any drilling or development work (excluding amounts payable only out of production or the gross proceeds from production, and amounts properly allocable to cost of depreciable property) done for them by contractors under any form of contract, including turnkey contracts. Examples of items to which this option applies are, all amounts paid for labor, fuel, repairs, hauling, and supplies, or any of them, which are used (i) in the drilling, shooting, and cleaning of wells; (ii) in such clearing of ground, draining, road making, surveying, and geological works as are necessary in preparation for the drilling of wells; and (iii) in the construction of such derricks, tanks, pipelines, and other physical structures as are necessary for the drilling of wells and the preparation of wells for the production of oil or gas. In general, this option applies only to expenditures for those drilling and developing items which in themselves do not have a salvage value. For the purpose of this option, labor, fuel, repairs, hauling, supplies, etc., are not considered as having a salvage value, even though used in connection with the installation of physical property which has a salvage value.

\* \* \* \* \* \*

(b) Recovery of optional items, if capitalized:

\* \* \* \* \* \*

(2) Items returnable through depreciation: If the taxpayer charges such expenditures as fall within the option to capital account, the amounts so capitalized and not deducted as a loss are returnable through depreciation insofar as they are represented by physical property. Such expenditures are amounts paid for wages, fuel, repairs, hauling, supplies, etc., used in the installation of casing and equipment and in the construction on the property of derricks and other physical structures.

\* \* \* \* \* \*

(c) Nonoptional items distinguished:

(1) Capital items: The option with respect to intangible drilling and development costs does not apply to expenditures by which the taxpayer acquires tangible property ordinarily considered as having a salvage value. Examples of such items are the costs of the actual materials in those structures which are constructed in the wells and on the property, and the cost of drilling tools, pipe, casing, tubing, tanks, engines, boilers, machines, etc. The option does not apply to any expenditure for wages, fuel, repairs, hauling, supplies, etc., in connection with equipment, facilities, or structures, not incident to or necessary for the drilling of wells, such as structures for storing or treating oil or gas. These are capital items and are returnable through depreciation.

\* \* \* \* \* \*

"Intangible drilling and development costs" (hereinafter IDC) is a phrase peculiar to the law of oil and gas taxation and, in the words of the above regulation, is used only "for convenience." [7] It describes all expenditures made for "wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas \* \* \*" The regulation allows an "operator" the option of deducting such

---

**7.** The use of such shorthand descriptions is, of course, a well-known technique in tax law. Consider, for example, such phrases as "spin-off," "collapsible corporation," "ABC transac-

tion," "Clifford trust," and many others, all unique to taxation with no common law significance.

expenditures from gross income as expenses or charging them to capital account.

Since the parties do not dispute that Humble was an "operator" entitled to make such election, that the offshore platforms are "physical structures," that they are "necessary for the drilling of wells and the preparation of wells for the production of oil or gas," and that the election was properly made, the controversy centers solely on whether the expenditures in question were for "labor, fuel, repairs, hauling, and supplies * * * used * * * in the construction" of offshore platforms, within the meaning of the regulation.[8]

Singularly enough, both parties rely solely on the language of the regulation in formulating their positions, and the result has been aptly described by defendant as "the pervasive semantical differences which exist in this case." Tracking the language of the regulation, plaintiff argues that all construction costs (including land costs) for items which in and of themselves have no salvage value (*e. g.*, labor, fuel, etc.) qualify as IDC, and emphasizes that the regulation specifically provides that "in general, this option applies only to expenditures for * * * items which in themselves do not have a salvage value" and that "for the purpose of this option, labor, fuel, repairs, hauling, supplies, etc., are not considered as having a salvage value, even though used in connection with the installation of physical property which has a salvage value." It also points to the provision that "the option * * * does not apply to expenditures by which the taxpayer acquires tangible property ordinarily considered as having a salvage value * * * [such as] the actual materials in [the] structures," and reiterates that in accordance with this latter excerpt, it has always capitalized the cost of such items as the steel pipes, beams, and other "actual materials" used in the construction of the platforms.

The defendant interprets the regulation differently but likewise directly from its wording. In the Government's view the examples given of items within and without the option create three major categories of construction-type costs, all of which do not qualify as IDC. First, there is the category of expenditures which are "used * * * in the construction of physical structures * * * which in themselves do not have a salvage value." These admittedly qualify as IDC. There is then a second category comprised of expenditures for labor, fuel, etc. "by which the taxpayer *acquires* tangible property ordinarily considered as having a salvage value." (Emphasis added.) These *acquisition* expenditures, in the Government's view, do not qualify for the option. Finally, there is a third category of expenditures for labor, fuel, etc. "used in connection with the installation of physical property which has a salvage value," and these are qualified IDC.

It is in this last category that the Government has placed a considerable portion of the water-phase costs and allowed them to be deducted as IDC. However, the Government argues that all expenditures by Humble prior to the commencement of the water phase, and a portion thereafter, were expenditures by which Humble *acquired* property having a salvage value, *i. e.*, the platform and its components. This classification of all land expenditures and a portion of the water-phase expenditures as *acquisition* costs is crucial to the Government's position that these costs must be capitalized. In my opinion, that position is untenable.

At the outset, it may be instructive to note briefly the history of the IDC option. Although it has been available to oil and gas operators since 1917, it did not originate from any specific statutory provision but rather from Treasury Department action in the form of regulations. Despite this somewhat unusual genesis, no serious attack on the validity of the option was made. But in 1945, the Fifth Circuit Court of Appeals severely restricted the coverage of the regulation to the consternation of the oil industry. *F.H.E. Oil Co. v. Commissioner*, 147

---

**8.** It is undisputed that the availability of the option is not impaired by the fact that Humble

contracted out both the land and water phases of the work to an independent contractor.

F.2d 1002, rehearing denied in 149 F.2d 238 and again in 150 F.2d 857 (5th Cir., 1945). This decision seemingly prompted the adoption by Congress of Concurrent Resolution 50, 79th Cong., 1st Sess., 59 Stat. 844 (1945) reading in its entirety as follows:

> *Resolved by the House of Representatives (the Senate concurring),* That in the public interest the Congress hereby declares that by the reenactment, in the various revenue Acts beginning with the Revenue Act of 1918, of the provisions of section 23 of the Internal Revenue Code and of the corresponding sections of prior revenue Acts allowing a deduction for ordinary and necessary business expenses, and by the enactment of the provisions of section 711(b)(1) of the Internal Revenue Code relating to the deduction for intangible drilling and development costs in the case of oil and gas wells, the Congress has recognized and approved the provisions of section 29.23(m)–16 of Treasury Regulations 111 and the corresponding provisions of prior Treasury Regulations granting the option to deduct as expenses such intangible drilling and development costs.

> Passed July 21, 1945.

Congress did not thereafter revisit the IDC option until 1954 when a new Internal Revenue Code was under consideration. At that time there was added to what became the Internal Revenue Code of 1954 a new provision designated Section 263(c) reading as follows:

> (c) *Intangible drilling and development costs in the case of oil and gas wells.* —Notwithstanding subsection (a), regulations shall be prescribed by the Secretary or his delegate under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress. 26 U.S.C. § 263(c).[9]

---

**9.** There is very little in the legislative history of the 1954 Code with respect to reasons for enactment of new § 263(c). The House Ways and Means Committee report (H.Rep. No. 1337 83d Cong., 2d Sess., U.S.Code Cong. & Admin. News, 1954, p. 4025) says nothing at all. The Senate Report notes that the House bill made no changes in prior law and that the Senate Finance Committee "has added an amendment to make it clear that the provisions of the bill do not affect the treatment now allowed by regulations [*i. e.,* Reg. 118, § 39.23(m)–16] relating to the deduction or capitalization of intangible drilling and development costs in the case of oil and gas." S.Rep. No. 1662, 83 Cong., 2d Sess., p. 81 (1954), U.S.Code Cong. & Admin. News 1954, pp. 4629, 4714. Likewise the hearings before both Committees disclose nothing particularly helpful in interpreting the regulations.

The predecessor and successor regulations to the one here in question are almost identical and little is to be gained from a comparison of the several versions. *Compare* Reg. 111, § 29.-23(m)–16 (1943) with Reg. 118, § 39.23(m)–16 (1951) and with Reg. §§ 1.263(c)–1 and 1.612–4 (1965).

Those commentators who have specifically addressed the question of offshore platform IDC are in disagreement among themselves. See, for example, Breeding, Burke & Burton, *Income Taxation of Natural Resources,* § 14.12 (1972) (offshore platform IDC not deductible); Baum, *Intangible Drilling and Development Costs: Some Recurring Problems,* 21st Inst. on Oil & Gas L. Tax. 337, 344 (1970) (IDC deductible); Klayman, *The New Intangible Drilling and Development Regulations and Their Implications,* 25 N.Y.U. Tax Inst. 99, 101 (1967) (IDC partially deductible); Andersen & Co., *Oil and Gas Federal Income Tax Manual* (8th ed.) (1960) pp. 328–9 (IDC deductible). In 1969, Miller noted the absence of court decisions and published rulings on offshore platform IDC, although in the 1974 edition of his book he reported the issuance of Rev.Rul. 70–596, the correctness of which is presently in issue. Miller, *Oil & Gas Federal Income Taxation* §§ 20–32 (1969 and 1974).

For general discussions of IDC in their various ramifications, see also Bennion, *Intangible Drilling and Development Costs: The Final Regulations,* 15 Tul. Tax Inst. 665 (1965); Fiske, *Federal Taxation of Oil and Gas,* 5 Oil & Gas Tax Q. 83 (1956); Fielder, *The Option to Deduct Intangible Drilling and Development Costs,* 33 Tex.L.Rev. 825 (1955); Miller, *The Intangible Drilling Deduction,* 100 J. Acc. 40 (Sept. 1955); Jackson, *Tax Planning Before Drilling: The Operator's Problem,* 27 Tul.L.Rev. 21 (1952); Judge, *Problems of the Oil and Gas Industry: Federal Income Tax Problems,* 9 N.Y.U. Tax Inst. 453 (1951); and Mahin, *Deduction for Intangibles,* 2d Inst. on Oil & Gas Tax L. 367 (1951).

■ From this statutory and administrative history of the IDC option, Circuit Judge (now Mr. Justice) Blackmun, speaking for a unanimous court in *Harper Oil Company v. United States* was able to conclude at 425 F.2d 1335, 1342 (10th Cir., 1970):

> The option, although long possessed of dubious statutory ancestry, now has firm congressional authority in § 263(c) of the 1954 Code.

This brief account of the option's history has been stated as a prelude to the conclusion that Congress has consistently viewed the optional treatment of IDC as an incentive to oil and gas prospecting and exploration, clearly a continuing objective of national importance.[10] It follows that Congress favors a liberal interpretation of the regulation. For example, in the House Report accompanying Concurrent Resolution 50, *supra,* it is stated that the "uncertainty occasioned by raising doubts as to the validity of these regulations is materially interfering with the exploration for and production of oil." H.R.Rep. No. 761, 79th Cong., 1st Sess., p. 2 (1945). Similar concerns were expressed during floor debates on the resolution. 91 Cong.Rec. 7801–12, 8967–70, and 7891–93 (1945).[11]

■ These background observations show that the courts should not be niggardly in their approach to Reg. 118, § 39.23(m)–16.

Otherwise, there is always the danger of becoming far too busy with the trees to see the forest. Equally important, however, is the realization that dealing with some of the "chameleon-hued words"[12] of the regulation is a perilous venture during which care must be taken not to extend the obvious benefits of the IDC option beyond its intended boundaries, whether inadvertently or by verbal ingenuity. And, insofar as the courts are concerned, at least, no weight should be given to the revenue impact of a Congressionally-approved tax incentive such as the IDC option.[13]

Keeping in mind the rather cordial attitude demonstrated by Congress towards the IDC option, I now turn to the specific words of the regulation as they apply to the costs of constructing an offshore platform. The costs generally incurred by an oil and gas operator (such as Humble) in such construction fall into several broad categories. They are the costs of the actual materials used in the structure, labor necessary to construct the same, transportation thereof, and miscellaneous costs such as repair work, fuel, supplies, and the like. Of these several categories, the regulation clearly provides that the "costs of the actual materials in those structures" may not be expensed but must be capitalized and depreciated.[14] Reg. § 39.23(m)–16(c)(1). With equal clarity, however, the regulation grants an option

---

**10.** By providing an immediate "write-off" of expenditures normally capitalized and amortized over a period of time, the deduction theoretically reduces or otherwise offsets the well-known risks of providing capital for oil and gas exploration. See, generally, Jackson, *Tax Planning Before Drilling: The Operator's Problem,* 27 Tul.L.Rev. 21 (1952) (concluding that, on the average, 60 percent or more of the costs of a producing well are IDC, and that the deduction is allowed to induce the *risking of such capital*). See, also, Murray, *Intangible Drilling and Development Costs of Oil and Gas Wells,* 26 Taxes 312, 316 (1948) (stating that a major purpose of the option privilege is to provide an offset to the "considerable risks involved in drilling").

**11.** In passing, it may be noted that when an opportunity arose to undercut or abolish the drilling incentives provided by the option, Congress did not do so. See 1939 Code, § 711(b)(1)(I), of the now repealed Excess Profits Tax of 1940. By providing therein that IDC

deductions would be disallowed only if "abnormal" or otherwise excessive for the previous four years, Congress appears to have affirmed its policy of encouraging the *risking of capital* in drilling operations.

**12.** See Hohfeld, *Fundamental Legal Conceptions, p. 35* (1923).

**13.** The estimated revenue loss attributable to expensing IDC in the Budget for F.Y.1968 was $300,000,000. In the Budget for F.Y.1976 the estimate had increased to $1,365,000,000. For an erudite discussion of the policy of using tax incentives to achieve non-tax goals, see Surrey, *Tax Incentives as a Device for Implementing Government Policy,* 83 Harv.L.Rev. 705 (1970).

**14.** As previously noted, Humble did not expense such costs but charged them to capital account.

to the operator with respect to all other of the categories listed above. The very first sentence of § 39.23(m)–16(a)(1) states:

All expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas, may, at the option of the operator, be deducted from gross income as an expense or charged to capital account.

The regulation then goes on to place two conditions on the optional expensing of these cost items, namely, (1) they must have been incurred "in the construction of such derricks, tanks, pipelines and other physical structures as are necessary for the drilling of wells and the preparation of wells for the production of oil or gas," and (2) they must not in and of themselves "have a salvage value."

The record in this case shows that, from time to time, plaintiff has recovered some materials from salvaged platforms which it reconditioned and used in other platforms. This fact is immaterial, however, because the regulation also makes it clear that of the several costs enumerated above:

* * * labor, fuel, repairs, hauling, supplies, etc., *are not considered as having a salvage value,* even though used in connection with the installation of physical property which has a salvage value. [Emphasis supplied.]

Since it is agreed on both sides that the only costs in issue here are wages for labor, fuel, repairs, hauling, supplies, and the like, all of which were "incident to and necessary for the drilling of wells" at sea, and since the listed expenditures in themselves do not have a salvage value, it would seem that the "bottom line" has been reached and the matter is at an end.

But not so, says the defendant. Pointing to the use of the word "installation" in the sentence of the regulation last quoted above, defendant concludes that the scope

of the IDC option has been specifically limited so that only those expenditures incurred in the course of installing the constructed property at the well site are deductible. This interpretation excludes from the option all expenditures made in the construction of physical property at a place other than the well site no matter how necessary such pre-installation construction may have been to the drilling and preparation of the well. Such emasculation of a long-standing regulation, recognized and approved by Congress in § 263(c), *supra,* simply cannot be sustained.[15]

In seizing upon this isolated word "installation" as controlling the entire operation of the regulation, defendant has grossly misread its own language. The obvious reason for the clause in question is to eliminate a possible contention that the option-type expenditures (labor, fuel, etc.) acquire a salvage value simply because they were connected with the installation of admittedly salvable property. Thus, as plaintiff correctly observes, the clause in no way restricts the application of the regulation but instead expands it to include a situation where option-type expenditures can be related to salvable property without losing their own characterization as nonsalvable items.

In the process of advancing its impoverished interpretation, the defendant quite naturally has attempted to present it in respectable attire. Citing such authoritative decisions as *Commissioner v. Idaho Power Co.,* 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974) and *Southern Natural Gas Co. v. United States,* 412 F.2d 1222, 188 Ct.Cl. 302 (1969), defendant says there can be no question that labor, fuel, repairs, hauling, and supplies used in the construction of physical structures "are to be treated as part of the cost of acquisition of a capital asset." *Idaho Power Co., supra,* 418 U.S. at p. 13, 94 S.Ct. at p. 2765. Hence, they "should be included in the asset's de-

---

**15.** The Treasury's issuance of a regulation followed on by a later refusal to apply it where to do so would result in the collection of less revenue has been referred to by a respected

commentator as "bizarre administrative behavior." Eisenstein, *A Critical View of the Treasury,* 15 N.Y.U. Inst. on Fed. Tax 21, 30 (1956).

preciable base, to be recovered over the life of the asset." *Southern Natural Gas Co., supra,* at 412 F.2d 1265, 188 Ct.Cl. 373.

Reliance on these cases for such a well-established rule of tax law illustrates the poverty of defendant's argument and reveals to what extent it would mutilate the specific exception to the general rule as spelled out in Reg. 118, § 39.23(m)–16. Those cases involved Code § 263(a) (or a predecessor section) providing that "no deduction shall be allowed for * * * any amount paid out for new buildings * * * or betterments made to increase the value of any property * * *" In contrast, § 263(c), which adopted by reference the long-standing IDC option to deduct or capitalize such costs, is an *express* exception to § 263(a) and provides a choice between deduction and capitalization "notwithstanding subsection (a)." Neither section 263(c), nor the implementing regulation, was involved in the cited cases. Apparently, defendant simply refuses to recognize that the IDC deduction was intended to and does deviate significantly from the usual rules of capitalization as epitomized by § 263(a).

Next, defendant rather surprisingly relies on the decision in *Harper Oil Co., supra.* The dispute there was over whether "surface casing," which is steel pipe installed in the well to prevent water contamination and surface caving, qualified for the IDC option. The taxpayer argued that such casing did qualify because it was cemented into the ground, could not be removed under Oklahoma law, and thus had no salvage value. The Tenth Circuit disagreed and held that the cost of casing, specifically described by subsection (c) of the regulation as a nonoptional item, remained such even though under the particular circumstances the casing could not, in fact, be salvaged. Plaintiff, of course, finds no fault with this decision since it has never contended that any of its costs specifically described by the regulation as nonoptional items (such as "actual materials" or "casing") can qualify for the option simply because some of them may be nonsalvable. To the contrary, plaintiff instead understandably relies on the clear distinction made by the *Harper Oil* decision itself as follows at 425 F.2d 1342:

> * * * One might expect an expenditure for tangible hard goods, such as surface-casing, or any casing for that matter, not ordinarily to qualify as an "intangible" drilling or development cost. *Standing in contrast, and qualifying, would be an appropriate labor or services cost.* [Emphasis supplied.]

Defendant's final point with respect to its salvage argument is that an offshore drilling platform becomes completely salvaged at the instant of an oil or gas "strike" which has the effect of converting the structure from a drilling facility to a production facility. While it is true that by the express terms of the regulation the IDC option is available only for the enumerated costs incurred during the "drilling" and "preparation" stages, it is a monstrous step to the defendant's conclusion that "total salvage" of the entire facility occurs at the moment the oil string of casing reaches the oil trap in the producing sands. This would mean, of course, that *no* costs relating to a platform are deductible because they *all* have salvage value as part of a production facility. Yet, inconsistently with its argument, defendant concedes that hauling and installation costs are optional expenditures. Therefore, to accept such an argument would only "lead to possible inconsistencies and certainly to taxpayer and administrative confusion." *Harper Oil Co., supra,* at 1343.

In addition, as plaintiff cogently points out, the argument is directly contrary to Treas.Reg. § 1.167(a)–1(c) (and predecessor authorities) which provides that salvage occurs only "upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer." Clearly, plaintiff's further utilization of platforms in the production of oil and gas is totally incompatible with the platforms being "retired from service" and "no longer useful in the taxpayer's business."

In a supplemental brief, defendant argues that plaintiff's reference to a provision dealing solely with depreciation is misleading. This accusation stems from defendant's contention that the words "salvage value" when used in a provision dealing with computation of basis for depreciation mean something entirely different from those same words as they appear in the IDC regulation because there they are used in their "abstract sense." This Alice-in-Wonderland approach cannot be accepted.[16] Defendant says it is "critical to an understanding of the subject Regulation to appreciate that it applies only to qualifying expenses incurred in the drilling phase of the oil and gas business." Df's Supp.Br., p. 3. No one disputes the validity of this statement just as no one disputes the proposition that the actual materials used in the construction of an offshore platform have salvage value. However, it is necessary to repeat, perhaps *ad nauseam,* that plaintiff did not deduct the costs incurred for such items.

If, by the statement quoted above, defendant means to infer that the only deductible expenditures are those incurred during the "drilling phase" at the well site itself, then defendant is plainly wrong. In this connection, defendant has stated at pp. 22–23 of its main brief:

> * * * The costs of fabricating derricks, which were purchased by the taxpayer in a prefabricated stated as "a derrick", have never been considered as being allowed by the Regulations, and the taxpayer does not suggest otherwise.

■ In fact, however, plaintiff does "suggest otherwise." It vigorously, and correctly, attacks defendant's statement as "unsupported," and points to those provisions of the regulation which clearly state that the regulation covers optional expenses incurred by "contractors under any form of contract" and which specifically give as examples of deductible costs those "amounts paid for labor, fuel, repairs, hauling, and supplies, or any of them which are used * * * in the construction of such derricks * * * as are necessary for the drilling of wells and the preparation of wells for the production of oil or gas." Accordingly, plaintiff properly concludes that, when an operator who has elected the option contracts for a derrick to be built to specification, it has no choice but to deduct on a current basis those costs attributable to the contractor's expenditures for labor, fuel, supplies, hauling and repairs. In like manner, when a platform is built under contract for an operator who has elected the option, as in this case, those same costs must be deducted currently under the regulation.

■ In sum, then, it must be concluded that the restrictive interpretation given to Reg. 118, § 39.23(m)–16 by the Government as reflected in Rev.Rul. 70–596, *supra,*[17] and elaborated upon in its briefs herein should be disapproved. By the expedient of a stingy reading, one should not frustrate the obvious Congressional purpose to encourage oil and gas prospecting, for to do so would be the most emphatic type of judicial legislation. The fragmentation of the regulation inherent in the Government's interpretation can only result in the proliferation of ambiguities, overlaps, and problems of categorization, to say nothing of leading to that "taxpayer and administrative confusion" decried by Mr. Justice Blackmun in *Harper Oil.* It is far preferable and more consistent with the regulation's purpose to interpret it as setting forth a simple and basic rule that optional intangible drilling and development costs are those expenditures by an oil and gas operator for items which are incident to and necessary for the drilling of wells *and* which, when each is considered individually as a unit in and of itself, have no salvage value.

---

16. "When I use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean—neither more nor less." Carroll, *Through the Looking Glass,* Dial Press Ed., p. 238.

17. We are reminded in the "Introduction" to each issue of the Internal Revenue Bulletin that the Revenue Rulings published therein "do not have the force and effect of Treasury Department Regulations * * *"

Hence, Exxon is entitled to recover. The record indicates no dispute as to the amount of costs at issue, but to the extent disagreement should arise, determination of the exact amount of recovery will be made in further proceedings as contemplated by Rule 131(c).

DAVIS, Judge, concurring:

Although I do not find the result in this case to be absolutely clear, I agree with Trial Judge Fletcher's conclusion and, in general, with his basic reasoning. Certainly the opening bars of the regulation present a broad all-embracing theme wholly in harmony with the taxpayer's claim that it has the option to charge off as expenses *all* intangible drilling and development costs incurred in the development of its offshore oil and gas properties. It is only the later interpolation of the "salvage value" motif which allows the Government to argue that the costs now in question add salvage value to tangible items (*e. g.* templets) and must therefore be depreciated as part of those capital assets. But the more natural and less strained reading of the regulation—in view of its over-all structure; the dominant placement of the main theme and the later introduction of the "salvage value" concept in subordinate and contrasting fashion; the precise words used with respect to the idea of "salvage value"—seems to me to attach "salvage value" only to physical and tangible materials and to exclude it entirely from those expensible items which the regulation designates as "intangible drilling and development costs" (*i. e.* amounts paid for labor, fuel, repairs, hauling, supplies, etc.) even though those intangible items may be expended in connection with templets or other such tangible fabricated property. In other words, the regulation, in its references to "salvage value," contrasts the intangible costs as to which the taxpayer has the option with the costs of the physical materials as to which he does not. The "salvage value" references simply contrast and define the other side of the coin. They do not have the affirmative function (as defendant would have it) of carving out of the regulation's broad opening (and all-embracing) provisions certain types of intangible drilling and development costs which cannot be expensed. The purpose of the "salvage value" sentences is, rather, to contrast the drilling and development items which are not intangible costs of any kind, but which "in themselves" have salvage value because they directly involve tangible materials.

Defendant emphasizes the term "installation" in one sentence [18] as showing that intangible costs are to be covered by the option only if they can add nothing to salvage value; installation costs, it is said, fall into that category because they have to be reversed when the property is salvaged, while intangible fabrication costs continue to form part of salvage value. But this explanation proves too much even from defendant's own viewpoint. Hauling expenditures and much of the cost of fuel (both expressly designated by the regulation as intangible costs) can add no salvage value to fabricated products, and yet defendant insists on their exclusion from coverage. The preferable interpretation of the sentence seems to me that given by the trial judge—to eliminate a possible contention that the option-type intangible expenditures acquire a salvage value simply because they are connected with the installation of admittedly salvageable tangible property.

Similarly, the other sentence on which the Government mainly relies [19] was not meant, as I see it, to limit or restrict the broad reach of the opening part of the regulation but, instead, to point out, by way of comparison and contrast, those tangible drilling and development costs which are

---

18. "For the purpose of this option, labor, fuel, repairs, hauling, supplies, etc., are not considered as having a salvage value, even though used in connection with the installation of physical property which has a salvage value."

19. "The option with respect to intangible drilling and development costs does not apply to expenditures by which the taxpayer acquires tangible property ordinarily considered as having a salvage value."

not open to optional treatment. The very next sentence tells us what are these non-covered expenditures-for-tangibles: "Examples of such items are the costs of the *actual materials* in those structures which are constructed in the wells and on the property, and the cost of drilling tools, pipe, casing, tubing, tanks, engines, boilers, machines, etc." (emphasis added.) This sentence does not exclude the whole cost of the structure—including the intangible costs involved in the construction of the structures—but only "the costs of the *actual materials* in those structures (emphasis added).

Perhaps the regulation, which was formulated before off-shore drilling was foreseen, is too all-embracing for current conditions. Perhaps it should be narrowed as defendant wishes. If so, the proper method is by prospective amendment of the regulation or by legislation, not by an attempt to read regulation in a drastic new way,[20] inconsistent with its long-standing terms and format, as well as contrary to its natural meaning.

BENNETT, Judge, concurring:

While I agree with Trial Judge Fletcher's result and join in the concurring opinion of Judge Davis, I believe a further comment is in order. A strong reason, not elsewhere articulated, for interpreting the regulation as the trial judge and plaintiff would have us read it is that their interpretation is workable. Defendant's reading of the regulation, on the other hand, would present substantial difficulties in the administration of the tax laws. The court should not strain to reach an interpretation, not clearly compelled, that would have such a result. *Commissioner v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965); *Steuer v. United States,* 207 Ct.Cl. 282, 294 (1975); *Kantor v. United States,* 205 Ct.Cl. 1, 6 (1974). There is considerable appeal in defendant's view of the regulation, for the theory that it ascribes to the regulation's

accounting scheme is familiar: one-time expenditures for items that contribute to the construction of platform components with continuing value should be capitalized and depreciated, rather than expensed. If, however, certain otherwise intangible drilling costs are to be capitalized, according to defendant's theory, it would become necessary to determine exactly what components of the final assembly could be saved as they are and subsequently reused. This would not be an easy exercise.

The trial judge pointed out that each platform in the present case was designed to accommodate ocean depth and current conditions at the proposed drilling site. This immediately leads one to suspect that platform component subassemblies are not uniformly salvable. In this case, one platform was dismantled and its parts stored in roughly their state of assembly at the completion of the land-phase construction stage. Does this warrant the conclusion that all platform components, or all of plaintiff's forerunner's 1954 platform components, are salvable in the same state of assembly? Is the entitlement to current deductions or the requirement of capitalization under the regulation to be determined in each case on the basis of a plaintiff's salvage history? What would be the plight of a future plaintiff who could point to no instances of salvage, so successful were his geologists' predictions? Defendant's argument that a taxpayer would be required to capitalize the intangible costs of building those components "ordinarily" possessed of continuing value, tracking the language of subsection (c)(1) of the regulation and the reasoning of *Harper Oil Co. v. United States,* 425 F.2d 1335 (10th Cir. 1970), while perhaps removing the subjective element from the determination, would not make its rule any easier to apply. The focus of the questions may shift: What is the "ordinary" state of assembly in which a component of a tailor-made platform remains after the platform is dismantled? To ascertain the ordinary

---

**20.** So far as we have been informed, there is no indication of any IRS practice, prior to the emergence of the off-shore problem, of excluding from optional coverage any intangible drilling and development costs connected with the fabrication or construction of land-based derricks or other drilling equipment.

salvage value of a component, is one to consult industrywide history or practice of salvage, or expert opinion regarding what would have been reusable? Despite the difficulty of the questions and the imprecision that would necessarily result from resort to estimation, the drilling operator's accountants and the IRS's auditors would be expected, under defendant's approach, to come up with answers on salvage value in exact figures, and to do so in the year of the platform's construction, not in the year of its razing.

Were we to follow defendant's reading of the regulation, the accounting for each platform would potentially revolve about fact problems not at all readily resolved or resolvable. Considering the number of platforms built (with changing technology) by a variety of drilling operators since 1954, and yet to be built, the problem takes on staggering proportions. For the added reason that defendant's interpretation of the regulation would be altogether cumbersome in application for the taxpayer, the IRS, and for the courts when the first two cannot agree, the court does well to avoid that interpretation and to stand by the reading that it adopts.

KUNZIG, Judge:

I concur in the per curiam opinion of the court and further express my general agreement with the separate views stated by Judges Davis and Bennett.

KASHIWA, Judge, concurring in part and dissenting in part:

In this case of offshore drilling operations, the majority of the court by affirming and adopting the trial judge's recommended decision allows as intangible drilling and development costs ("IDC") those costs incurred in fabricating offshore drilling platforms ("platforms"), moving them to location and making them operational. I, however, would allow only the latter two groups of expenditures to qualify for the IDC option, denying the option to those costs incurred in fabricating the component parts (e. g., templets) [21] of the drilling platform.

With relation to the IDC problem before us, I believe that the goal is to determine which costs are attributable to an item having a salvage value and which costs are attributable to wages, fuel, repairs, hauling and supplies incurred in using that item for the drilling of wells or their preparation for production.[22] It seems clear that the costs of moving the platform from the shore to the place where it will be used for drilling and of securing it so that it can be so used qualify as IDC. On the other hand, a strong argument can be made that the cost of fabricating the component parts of the platform does not fall within the option on the ground that the component parts are items having a salvage value.

Each 1954 platform was individually designed for a specific location to take account of the peculiarities of that location; however, the basic concept and design was a templet-type offshore platform.[23] The design differences among platforms and platform extensions at different locations included the number of templets utilized to provide horizontal support for the platform

21. For ease in discussion throughout this opinion, I will refer only to templets as the pre-fabricated basic component parts of the drilling platform. However, there were other pre-fabricated basic component parts, such as cap and portal sections. To the extent that the other basic component parts are similar to the above discussed templet sections, I would deny the IDC option to the costs incurred in fabricating those component parts.

22. The costs to which I refer, in addition to the enumerated costs, include the cost of insurance and taxes, as well as the contractor's overhead and profit.

23. All platforms built or extended by Humble (plaintiff's predecessor) in 1954 were templet-type platforms. Findings of Fact, No. 8. Therefore, this opinion does not consider with respect to the IDC option the other types of offshore structures used by oil companies in 1954, such as caissons and jacket-type platforms.

pilings and the size of the deck areas.[24] However, the basic component, the templet unit, was standard for all platforms.[25] This basic templet unit came only in two sizes, 10′ × 10′ and 20′ × 20′.[26] Despite the size difference, the templet unit was designed, fabricated, installed, salvaged, repaired and stored as a basic unit. The unit never reverted back to its original state, viz., "such as lengths of pipe and steel beams." [27]

The fabrication process was the manner by which Humble acquired the templet unit. During the fabrication process of this basic templet unit, labor, fuel and supplies were integrated with tangible basic materials to form an item. The item, a basic templet unit, was designed to be salvaged.[28] When salvaged the labor, fuel and supplies that went into its fabrication were also salvaged. As a result, the costs attributable to wages, fuel and supplies incurred during the fabrication of this templet unit should not qualify for the IDC option because they were "expenditures by which the taxpayer * * * [acquired] tangible property ordinarily considered as having a salvage value." Treas.Reg. 118, § 39.-23(m)–16(c)(1). Those costs, therefore, are recoverable only through depreciation.

The fact that dismantling and salvaging of platforms was a difficult operation and that during the salvage operation parts of the platform were badly damaged while other parts were not salvaged at all does not affect the IDC option. In the words of Justice Blackmun:

> The salvage value reference [29] [Reg. § 1.612–4(c)(1) (1965)] strikes us only as the usual, but not the necessary, characteristic of the non-option item. We do not regard salvage value as a condition of non-option status. [Footnote supplied.] [*Harper Oil Co. v. United States,* 425 F.2d 1335, 1342 (10th Cir. 1970).]

Since the templets were designed to be salvaged as a component part in unit form, they ordinarily would be considered as having a salvage value without regard to the frequency of actual salvage or the actual reasons therefor. Nevertheless, as the trial judge found, "after considerable modification and reconditioning, most of the salvaged parts of [the platform] * * * were reusable at least once in other platforms." [30] The extent of modification to which the trial judge refers is the joining together of several 10′ × 10′ templets in order to form a 10′ × 20′ templet, or the adding of extensions to the basic templet unit.[31] The basic unit design of the templet

---

**24.** For other design differences, see Findings of Fact, No. 7.

**25.** Templets are fabricated structures composed of steel beams and pipe which are designed to support the platform deck.

**26.** A well-documented pictorial treatise, "Humble Oil and Refining Company, Civil Engineering Project Report, July 20, 1956," Joint Exhibit 1, in evidence and part of the record of this case, visually presents the construction of a Humble offshore drilling platform.

**27.** See Findings of Fact, No. 4.

**28.** On October 29, 1954, Humble wrote to Williams requesting a bid for the dismantling and salvaging for reuse of a platform, stating in part: " * * * In dismantling the platform, the material should be removed as nearly as possible in sections and shapes that can be reused in future construction and should be handled in such manner as to prevent damage to the sections. *Contractor will be expected to remove the templets intact* and to pull the pil-

ing and anchor piles from the Gulf bottom." [Emphasis supplied.] Williams was awarded the salvage job contract. Attached thereto was an exhibit titled "Specifications for Salvage of Offshore Platforms" reading, in part, as follows:

"The platform shall be *dismantled in sections or parts corresponding to the prefabricated sections or parts* from which the platform was erected. * * *

\* \* \* \* \* \*

"*Templet sections, cap and portal sections and other fabricated sections shall be stocked as units. * * *"* [Emphasis supplied.] [Findings of Fact, No. 23.]

**29.** Although Justice Blackmun was referring to Treas.Reg. § 1.612–4(c)(1) (1965), that identical language appears in Reg. 111 § 29.23(m)–16(c)(1) issued under the 1939 Code and applicable to the instant case.

**30.** Findings of Fact, No. 24.

**31.** Findings of Fact, No. 25.

was never altered. As a result, the labor, fuel and supplies utilized to fabricate the lengths of pipe and steel beams into a templet were permanently integrated into the templet, and thereby had salvage value.[32]

After having carefully read the trial judge's recommended decision and before entering into further discussion, I note the focal emphasis in the trial judge's opinion is not on the basic templet component unit as above described but, rather, is on the tangible basic materials which make up the templet unit. In my opinion, the trial judge incorrectly assumes that the intangible basic materials (labor, fuel and supplies) utilized to fabricate the tangible basic materials (steel beams and pipes) into a templet unit do not have a salvage value. I view the costs attributable to labor, fuel and supplies, etc., incurred by the taxpayer in fabricating the basic templet unit as expenditures by which the taxpayer acquired "tangible property [the templet unit] ordinarily considered as having a salvage value." Reg. 118, § 39.23(m)–16(c)(1). Therefore, those expenditures are nonoptional items.

I do not feel that a complete reading of the pertinent Regulations, in light of their history, provides support for the trial judge's decision within the intent of the drafters of the Regulations.

The IDC option first saw light in T.D. 2447, relating to the Revenue Act of 1916, and read as follows:

> The *incidental expenses* of drilling wells, that is, such expenses as are paid for wages, fuel, repairs, etc., *which do not necessarily enter into and form a part of the capital invested or property account,* may, at the option of the individual or corporation owning and operating the property, be charged to property account subject to depreciation or be deducted from gross income as an operating expense. [Emphasis supplied.]

The Treasury language was a cautious venture into the field, granting the option in guarded terms. The option was similarly stated, though in more detail, in the regulations promulgated under the Revenue Acts of 1916, 1917, 1918, 1921, 1924 and 1926.

In 1932, Treasury Decision 4333 [33] restated the provisions of all prior regulations relating to intangible drilling and development costs. The restated regulations,[34] said to make "no change in administrative policy or in the practice under the regulations," [35] more clearly described the IDC option. The pertinent provisions of Reg. 118, here in issue, remain virtually unchanged in form as carried forward from T.D. 4333.[36]

32. An item not in issue in the present case but still analogous to the basic templet unit is the component parts of the derricks which were used on the 1954 platforms.

The derricks were constructed for Humble by contractors. Rolled steel shapes, such as angles, channels and beams, as well as steel grating, bolts and washers, were used in fabrication of derricks. These basic materials were fabricated into derrick parts by cutting the pieces to length, punching them for bolt holes and galvanizing them. The parts thus fabricated and comprising the part required for a complete derrick were purchased by Humble from the supplying firm as a dismantled derrick. These parts were then erected into a derrick on the platform by a rig building contractor. When the derrick was no longer required on the platform, due to cessation of drilling operations, it was dismantled, transported to another platform and re-erected. (Findings of Fact, No. 27).

As with the basic templet unit, those costs incurred in moving, assembling and making the derrick parts operational as a derrick would in a proper case be allowed to qualify for the IDC option. The expenditures for wages, fuel and supplies, etc., incurred in fabricating the basic tangible materials into derrick parts would not qualify for the IDC option.

33. T.D. 4333, XI–1 Cum.Bull. 31 (1932).

34. Treas.Reg. 103, § 19.23(m)–16.

35. T.D. 4333, *supra* at 31.

36. It should be noted that in 1943 the Treasury issued T.D. 5276 (1943 Cum.Bull. 151, amending Treas.Reg. 103) which constituted a complete overhaul of the IDC option for taxable years beginning after December 31, 1942. Except for the fact that costs subject to the IDC option were defined to include the cost to the operator of any drilling or development work done for him by contractors under any form of contract, T.D. 5276 did not change with respect to the instant case any pertinent provision of T.D. 4333, which carried over to Reg. 118.

In 1945 Congress passed Concurrent Resolution 50,[37] approving the existing and prior regulations relating to the option. With the adoption of the 1954 Code, in Section 263(c) Congress did no more than direct the Treasury to prescribe regulations corresponding to the regulations which were approved by Congress in Concurrent Resolution 50.

This brief account of the history of the IDC option is important with respect to an interpretation of Reg. 118 provisions here in issue.

The drafters of the regulations, as above shown, have consistently demonstrated an intent to qualify for the IDC option those costs which are "incidental expenses," costs which do not "enter into and form a part of the capital invested or property account," and costs "which in themselves do not have a salvage value." In other words, expenditures by which the taxpayer does not acquire "tangible property ordinarily considered as having a salvage value" have been the recurring theme to determine qualification of expenditures for the IDC option.

The relevant provisions, as applied to the instant case, of Treas.Reg. 118, construed in light of the drafters' apparent overall goal, set forth the task to determine which costs are attributable to an item having a salvage value and which costs are incurred in using that item for the drilling of wells or their preparation for production. As previously analyzed, the items of expense incurred in fabricating the salvageable component parts of the platform structure did add value to the basic tangible materials which in part comprised the component unit and that value can be salvaged when the overall structure is dismantled and the components reused. On the other hand, the items of expense incurred in assembling the component parts to form a section, in moving the section to the drilling site and in securing it so that it can be used for the drilling of wells qualify for the IDC option. This latter group of costs are labeled in the regulations as hauling and installation costs.

Although the trial judge acknowledges that the basic component units of the platform do have a salvage value,[38] he interprets the regulations to restrict the application of the "salvage value" phrase so as to have that phrase relate only to the tangible raw materials from which the templets and other basic components were fabricated. Recognizing that subsection (c)(1) of the IDC regulations gives "examples" of items to which the option does not apply, the trial judge focuses on the fact that the taxpayer does not seek to deduct the cost of the "actual materials" used in the offshore platforms. Nevertheless, because under the taxpayer's practice the basic templet unit and other component parts of the platform are salvaged as a unit, the costs incurred in fabricating those component units have salvage value. The example which refers to the "actual materials" used in the offshore platforms within the sense of the regulation, in my opinion, includes the fabricated templet basic unit components. Those are the relevant "actual materials" from which the offshore platforms were constructed.

To buttress his conclusion that the costs incurred during fabrication of the basic component units do not have salvage value and thereby qualify for the IDC option, the trial judge quotes from the *Harper Oil* decision.[39] The trial judge emphasizes the last sentence of the above-mentioned quote, implying that *Harper Oil* supports his reasoning. To my understanding, the above referred to sentence lends support for this dissenting opinion rather than for the majority opinion. Justice Blackmun was directing comment to the labor, fuel and supply costs incurred in installing the casing, not to the labor, fuel and supply costs incurred in fabricating or manufacturing the casing. This observation becomes clear when one reads the entire paragraph from which the quoted passage is taken. By paraphrasing Mertens Law of Federal In-

---

**37.** H.R.Con.Res. 50, 79th Cong., 1st Sess. (1945); 1945 Cum.Bull. 545.

**38.** At page 556.

**39.** At page 557.

come Taxation and by referring to the "cost of * * * casing," Justice Blackmun clarifies his prior statement whereby he was referring to installation costs not manufacture costs, of the casing. Juxtapose Justice Blackmun's discussion concerning casing with my previous discussion concerning templet units. The result is that the cost of installing templet units, viz., assembling the units to form structural legs of the platform, would qualify for the IDC option; however, the cost of fabricating the basic templet units would not qualify for the IDC option.

The trial judge also placed great reliance upon the sentence in the regulations which reads:

> For the purpose of this option, labor, fuel, repairs, hauling, supplies, etc., are not considered as having a salvage value, even though used in connection with the installation of physical property which has a salvage value.

The trial judge correctly reasons that:

> * * * [t]he obvious reason for the clause in question is to eliminate a possible contention that the option-type expenditures (labor, fuel, etc.) acquire a salvage value simply because they were connected with the installation of admittedly salvable property. * * * [T]he clause in no way restricts the application of the regulation but instead expands it to include a situation where option-type expenditures can be related to salvable property without losing their own characterization as nonsalvable items. [At page 556.]

However, by focusing on the tangible basic materials instead of the salvageable basic component units of the platform, the trial judge, in my opinion, incorrectly concludes that Humble installed "lengths of pipe and steel beams." On the contrary, Humble installed the basic component unit. Consistent with the regulations, installation costs of the basic component unit are sub-

ject to the option; the only costs not subject to the option are those costs incurred in fabricating the platform components. It is those costs which I contend have a salvage value.

In order to support his conclusion that the above-quoted regulation sentence bring fabrication as well as installation costs within the IDC option, the trial judge reasons that the drafters intended the word "installation" to expand the coverage of the IDC option to include "option-type expenditures [which] can be related to salvable property without losing their own characterization as nonsalvable items." Consistent with the trial judge's reasoning, the quoted sentence "expands" the coverage of the regulation only insofar as it assures that the immediately preceding regulation sentence [40] is not to be interpreted to disallow installation costs incurred with respect to salvageable property.

Another critical inquiry in this case is the proper meaning to be attributed to the words "in themselves." [41] In addressing the problem of interpreting this phrase, the trial judge chose to substitute the phrases "in and of themselves" (at page 556) and "in and of itself" (at page 558) for the actual words of the regulation. In my opinion the trial judge gave undue emphasis to the words "in themselves" and thereby failed to acknowledge the importance of subsequent language in the regulation which bears on the inquiry.

In at least three separate places in the Regulations in issue, installation costs are singled out for favorable treatment. Thus, the Regulations distinguish between those costs incurred in the installation of physical property and those costs incurred in acquiring the tangible items being installed. The labor, fuel, etc., used in erecting the platform structure, or in transporting the structure to the drilling site, add no value to the structure which can be salvaged when the drilling operation is completed and, hence,

---

**40.** "In general, this option applies only to expenditures for those drilling and developing items which in themselves do not have a salvage value." Reg. 118, § 39.23(m)–16(a)(1).

**41.** See note 40.

do not "in themselves" have salvage value. On the other hand, labor, fuel, etc., used in fabricating the salvageable components of such a structure do add value to and become integrated with the tangible basic materials comprising the component part. Therefore, the items, both intangible and tangible materials, have salvage value "in themselves." Having a salvage value "in themselves," the items do not qualify for the IDC option; the cost of the items must be capitalized and recovered only through depreciation. In other words, the general rule as stated in Section 263(a) of the Internal Revenue Code of 1954 is applicable, not the exception to the general rule, i. e., Section 263(c).

It should be noted that the IDC option remains, as it has been since its birth, an addendum to the general capitalization principle enunciated by § 263(a). *Harper Oil, supra* at 1342. Capitalization of this kind of cost is the rule and expensing the exception. The deduction afforded by § 263(c) is not a matter of right; rather, it is a matter of legislative grace. The deduction must be authorized by "clear provision." And it is the taxpayer who has the burden of demonstrating that he is entitled to the deduction. *Harper Oil, supra* at 1342; *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934); *Deputy v. duPont,* 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416 (1940); *United States v. Olympic Radio & Television, Inc.,* 349 U.S. 232, 235, 75 S.Ct. 733, 99 L.Ed. 1024 (1955); *New World Life Ins. Co. v. United States,* 26 F.Supp. 444, 88 Ct.Cl. 405 (1939); *Mayer v. United States,* 111 F.Supp. 251, 126 Ct.Cl. 1 (1953). In my opinion, the taxpayer in the instant case has failed to demonstrate by pointing to a clear provision in the regulations that it is entitled to deduct *via* the IDC option those costs incurred while fabricating the basic component units of its drilling platform. For the foregoing reasons, I am firmly convinced that the costs of fabricating the basic templet units, a necessary component part in the templet-type platform used by Humble during the tax years in question, are not subject to the IDC option.